1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT

9        FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ANTHONY CASTRO JR.,                    Case No.  1:22-cv-00054-BAM

12              Plaintiff,

                                            **ORDER DENYING PLAINTIFF'S MOTION**
13         v.                               **FOR SUMMARY JUDGMENT**

14   KILOLO KIJAKAZI, Acting Commissioner   (Doc. 14)
     of Social Security,
15

16              Defendant.

17

18

19                        **<u>INTRODUCTION</u>**

20         Plaintiff Anthony Castro ("Plaintiff") seeks judicial review of a final decision of the

21   Commissioner of Social Security ("Commissioner") denying his application for Social Security

22   Income ("SSI") under Title XVI of the Social Security Act.  The parties' briefing on the motion was

23   submitted, without oral argument, to Magistrate Judge Barbara A. McAuliffe.  (Docs. 14, 16, 17.)[1]

24         Having considered the briefing and record in this matter, the Court finds that the decision of

25   the Administrative Law Judge ("ALJ") is supported by substantial evidence in the record as a whole

26

27   _____

28   [1]     The parties consented to have a United States Magistrate Judge conduct all proceedings in this case,
     including entry of final judgment, pursuant to 28 U.S.C. § 636(c).  (Doc. 13.)

                                            1

and based upon proper legal standards.  Accordingly, this Court will deny Plaintiff's motion for summary judgment, deny his appeal of the administrative decision, and affirm the agency's determination to deny benefits.

## FACTS AND PRIOR PROCEEDINGS

Plaintiff filed an application for disability insurance benefits and supplemental security income on February 14, 2019.  AR 175-183.[2]  Plaintiff alleged that he became disabled on February 10, 2019, due to diabetes type 1 with peripheral neuropathy of feet; psychogenic non-epileptic seizures and possible petite mal seizures twice per month that are triggered by stress; hypertension with fatigue after activity; arthritis of hands and feet with daily pain; limited mobility and diminished grip; anxiety with heart palpitations and insomnia; monthly episodes of depression with feelings of hopelessness.  AR 24; 175-183, 189.  These claims were denied initially on August 15, 2019, and upon reconsideration on January 24, 2020.  AR 65-101, 111-117.  Subsequently, Plaintiff requested a hearing before an ALJ.  ALJ Kelli J. Kleeb held a hearing on January 15, 2021.  AR 37-69.  ALJ Kleeb issued an order denying benefits on the basis that Plaintiff was not disabled on May 14, 2021.  AR 19-36.  Plaintiff sought review of the ALJ's decision, which the Appeals Council denied, making the ALJ's decision the Commissioner's final decision.  AR 1-6.  This appeal followed.

### Hearing Testimony

The ALJ held an in-person hearing on January 15, 2021.  AR 37-69.  Plaintiff appeared with his attorney, Raymond Ribaya.  *Id.*  William H. Reed, an impartial vocational expert, also appeared and testified.  AR 57-63.  The ALJ admitted Exhibits 1A to 4A, 1B to 16B, 1D to 6D, 1E to 14E, and 1F to 28F into evidence.  AR 42.

Plaintiff's attorney, Mr. Ribaya, made an opening statement noting that Plaintiff was 43 years old at the time and suffered from diabetes mellitus I severe polyneuropathy, lumbar spine degenerative disc disease, chronic seizures, and a history of cardiac artery disease.  AR 42-43.  Mr. Ribaya further noted that Plaintiff had a recent hospitalization for COVID-19, chronic abdominal pain and nausea,

---

[2]     References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

and major depressive disorder.  AR 43.  Mr. Ribaya argued that Plaintiff would be precluded from any substantial gainful employment and should be found disabled under Step Five of the sequential evaluation.  AR 43.

In response to questions from the ALJ, Plaintiff testified that he completed high school.  *Id.*  Plaintiff further noted that he was able to do basic math such as addition and subtraction of small numbers and counting change.  *Id.*  At the time, Plaintiff lived with his mother, sister, and 23-year-old daughter.  AR 43-44.  Plaintiff collected food stamps, but no other cash or income.  AR 44.  He last worked in 2007 as an oil well technician and would work on a drilling rig where he would set up and maintain oil field tools.  *Id.*  He also drove a truck hauling oil field tools and had a commercial driver's license.  *Id.*  On the job, the heaviest thing he had to lift was ninety pounds.  AR 45.  He left his job as an oil well technician because his company shut down, and he did not work since then as he got sick, had numbness in his legs, and his diabetes "started getting out of control."  *Id.*

Prior to working as an oil well technician, Plaintiff worked as a cashier as a pet store where he stood and walked all day.  AR 45.  At the pet store job, Plaintiff had to lift boxes of up to 20-30 pounds.  AR 45-46.  Plaintiff also worked as an oil business equipment operator, which was a similar position to the oil well technician where he drove commercial trucks.  AR 46.  In that position, the heaviest item he had to lift was approximately 70 pounds.  *Id.*

Plaintiff testified that the reasons he is not able to work are recurrent seizures, neuropathy, and numbness in his legs.  *Id.*  He stated that he has neuropathy mainly in the lower extremities.  AR 47.  When asked if he would be able to do a job where he could sit most of the day, Plaintiff responded that he would probably not be able to do such a job due to his recurrent seizures.  *Id.*  Plaintiff has seizures approximately once per day, every day.  *Id.*  He has no recollection of what happens when he has a seizure.  *Id.*

In response to questions from his counsel, Plaintiff stated that the neuropathy and seizures prevented him from doing work.  AR 48.  Plaintiff has depression, which affects him through experiencing anxiety.  *Id.*  Plaintiff testified that the medications for depression and anxiety have helped him since switching medications.  *Id.*  Plaintiff's neurologist, Dr. Virdi, prescribes Plaintiff's medications for his mental condition, but he does not utilize talk therapy.  *Id.*  Plaintiff has had

abdominal pain, nausea, and vomiting almost every day beginning in the middle of 2020.  AR 48-49.  Plaintiff stopped using meth approximately four years prior to the hearing.  AR 49.  He was not using any other drugs or alcohol.  *Id.*

For the sensations in his lower extremities, Plaintiff took Gabapentin.  AR 50.  Plaintiff could stand and walk for approximately 20 minutes before needing to sit down.  *Id.*  After 20 minutes of standing and walking, Plaintiff has shortness of breath, his legs go weak, and his lower back hurts.  *Id.*  Plaintiff has a deteriorating disc in his lower back that causes sharp needle pains for which he receives Norco pain medication and epidural injections every three to four months.  AR 50-51.  The lower back pain had been an issue for approximately 1.5 years at the time of the hearing.  *Id.*  Plaintiff testified that he needs to rest for approximately 15 minutes between standing and walking for 20 minutes.  AR 51.  Plaintiff did not use a cane, walker, braces, or other assistive devices.  *Id.*  He testified that he could sit for approximately 15 to 20 minutes before needing to stand again.  AR 51-52.  Plaintiff testified that he could lift and carry approximately ten to 15 pounds at a time, but his back would begin to hurt and his legs would get weak if he attempted to lift more than 15 pounds.  AR 52.  He also testified that laying down is the most comfortable position for him during the day, and he lies down approximately 80 percent of the day to relieve pressure on his back.  AR 52-53.

Plaintiff testified that he did not have any problems with personal care including going to the bathroom, showering, or dressing himself.  AR 53.  He participates in chores such as doing the dishes and putting out the trash.  *Id.*  He can do the dishes without dropping them but has difficulty opening jars at times due to lack of hand strength.  *Id.*  Plaintiff testified that he cannot do yard work because he does not have the strength in his legs to push a lawnmower or to stand long enough to cut grass or hedges.  AR 53-54.  Plaintiff typically goes grocery shopping with his daughter and uses an electronic scooter to get around.  AR 54.  His grocery trips typically last approximately 20 to 30 minutes.  *Id.*  Plaintiff is able to interact with employees at the grocery store to find items.  AR 54-55.  Plaintiff gets along with his daughter, mother, and sister who he lives with.  AR 55.  Plaintiff does not spend time with other friends and family.  *Id.*  While Plaintiff spends 80 percent of his day in bed, he talks to family members and watches TV.  *Id.*  Plaintiff is able to watch a two-hour long movie and pay

4

attention to what is going on.  *Id.*  Plaintiff does not have issues with his memory and can take medication and arrive to doctors' appointments.  *Id.*

On reexamination of Plaintiff by the ALJ, Plaintiff stated that he previously did work for a church.  AR 56.  That work involved setting up booths and tents but ended approximately 1.5 years before the hearing.  *Id.*  Plaintiff noted that he did not attend church at the time of the hearing as it was closed due to the pandemic but had gone prior to the pandemic.  *Id.*  Plaintiff has not been able to walk his dog for approximately one to two years.  AR 56-57.  Plaintiff also had not been able to go on an exercise walk for approximately six months at the time of the hearing.  AR 57.  When he was able to go for exercise walks, he would walk approximately 2.5 blocks.  *Id.*

Following Plaintiff's testimony, the ALJ elicited testimony from VE William H. Reed.  AR 57-63.  The VE first asked clarifying questions and noted that he was confused about what Plaintiff meant by his position as an oil fields machine operator and maintaining tools.  AR 58.  Plaintiff clarified that he would set the tools up to computers, calibrate them, and oil and grease them.  AR 58-59.  Plaintiff further clarified that he dealt with both the oil wells and oil field tools in that position, setting up hoses, pumping chemicals, and cycling the oil well.  AR 59.  The tools Plaintiff used there weighed more than 50 pounds and they would connect the tools to the oil rig.  *Id.*

The VE then summarized Plaintiff's past work.  The VE summarized Plaintiff's oil well work as "heavy in exertional demand" and "at least semi-skilled, perhaps skilled."  AR 60.  The VE stated that Plaintiff's equipment operator position was "heavy… was at least semi-skilled perhaps skilled." *Id.*  Plaintiff's pet store cashier work had a "medium" exertional demand and was unskilled work.  *Id.*

The ALJ then asked the VE hypothetical questions.  AR 60-63.  For the hypotheticals, the ALJ asked the VE to consider an individual with the same age, education, and work background as the claimant.  *Id.*  The individual would be limited to performing light work, can only frequently climb ramps and stairs, frequently balance, and occasionally stoop, crouch, kneel, and crawl.  *Id.*  The individual can never climb ladders, ropes, or scaffolds, and should avoid all workplace hazards such as unprotected heights and moving machinery.  *Id.*  For the first hypothetical, the ALJ asked the VE if the hypothetical individual could perform any of Plaintiff's past work or if there would be jobs available in the national economy.  *Id.*  The VE testified that the individual could not perform any of Plaintiff's

past work, but that there would be jobs available in the national economy.  AR 60-61.  The VE stated that potential jobs included:  Cashier II (DOT 211.462-010; light, unskilled work; SVP 2; approximately 570,000 jobs); Fast Food Worker (DOT 311.472-010; light, unskilled work; SVP 2, approximately 1,450,000 jobs); and Sales Attendant (DOT 299.677-010; light, unskilled work; approximately 283,000 jobs).  AR 61.

For the second hypothetical, the ALJ added that the individual would be limited to simple, routine tasks and simple work-related decisions.  *Id.*  The VE testified that the Cashier II, Fast Food Worker, and Sales Attendant jobs would remain with those limitations and exist in the same numbers. *Id.*  The VE testified that there are typically three scheduled breaks for those positions, including a morning and afternoon break of approximately 15 minutes each and a lunch period of approximately 30 minutes.  *Id.*  The VE also noted that the vast majority of employers allow brief infrequent restroom and/or water breaks.  AR 61-62.  In responding to the ALJ's question regarding the employer's tolerance for off-task behavior outside of breaks, the VE further testified that off-task behavior would be above ten percent but below 20 percent, with Fast Food Worker being ten percent off-task.  AR 62. In terms of the employer's tolerance for absenteeism, the VE testified that the average new hire gets an average of eight days off the first year.  *Id.*  For the third hypothetical, the ALJ asked whether there would be work if the hypothetical individual had symptoms that caused them to be off task more than 20 percent of the time or absent twice a month.  *Id.*  The VE responded that there would not be work for such an individual.  *Id.*

The VE stated that his testimony was consistent with the DOT and SCO, but that those publications do not address issues in the limitations like breaks, off-task behavior, and absenteeism. *Id.*  The VE noted that his testimony on off-task behavior and absenteeism was based on documentation outside of the DOT and SCO and his testimony on breaks, off-task behavior, and absenteeism was based on his background, education, training, work experience, and knowledge of jobs, employer tolerances, and benefits.  *Id.*  Mr. Ribaya delivered his closing statement arguing that a disability determination was warranted as Plaintiff would be off-task and absent more than employers would allow.  AR 63.

///

**Medical Record**

The relevant medical record was reviewed by the Court and will be referenced below as necessary to this Court's decision.

**The ALJ's Decision**

Using the Social Security Administration's five-step sequential evaluation process, the ALJ determined that Plaintiff was not disabled under the Social Security Act.  AR 22-31.  Specifically, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 10, 2019, the alleged onset date.  AR 24.  The ALJ identified the following severe impairments: diabetes mellitus, neuropathy, lumbar degenerative disc disease, psychogenic seizures, peptic ulcer disease, hypertension, chronic kidney disease, coronary artery disease (CAD) with stenting, anxiety, and depression.  *Id.*  The ALJ additionally noted that Plaintiff was hospitalized with COVID-19 but did not appear to have lasting effects from that disease that met the duration requirements for a severe impairment.  *Id.*  The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments.  AR 24-26.

Based on a review of the entire record, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform light work with limitations to frequent climbing of ramps and stairs; never climbing ladders, ropes, and scaffolds; frequent balancing; occasional stooping, kneeling, crouching, and crawling; avoid all exposure to workplace hazards; and limited to simple and routine tasks and making simple work-related decisions.  AR 26.  With this RFC, and considering Plaintiff's age, education, and work experience, the ALJ found that Plaintiff was unable to perform any past relevant work but could perform work in the national economy, including positions such as: Cashier II (DOT 211.462-010; 570,000 jobs nationally), Fast Food Worker (DOT 311.472-010; 1,450,000 jobs nationally), and Sales Attendant (DOT 299.677-010; 283,000 jobs nationally).  AR 29-30.  The ALJ therefore concluded that Plaintiff had not been under a disability from the alleged onset date of from March 1, 2018, through the date of the decision.  AR 31.

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, this

1    Court must determine whether the decision of the Commissioner is supported by substantial evidence.

2    42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*,

3    402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112,

4    1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as

5    adequate to support a conclusion." *Richardson*, 402 U.S. at 401.  The record as a whole must be

6    considered, weighing both the evidence that supports and the evidence that detracts from the

7    Commissioner's conclusion. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the

8    evidence and making findings, the Commissioner must apply the proper legal standards. *E.g.,*

9    *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the Commissioner's

10   determination that the claimant is not disabled if the Commissioner applied the proper legal standards,

11   and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of*

12   *Health and Human Servs.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

14          In order to qualify for benefits, a claimant must establish that he or she is unable to engage in

15   substantial gainful activity due to a medically determinable physical or mental impairment which has

16   lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §

17   1382c(a)(3)(A).  A claimant must show that he or she has a physical or mental impairment of such

18   severity that he or she is not only unable to do his or her previous work, but cannot, considering his or

19   her age, education, and work experience, engage in any other kind of substantial gainful work which

20   exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).  The

21   burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir.

22   1990).

## DISCUSSION[3]

24          Plaintiff contends that the ALJ erred by failing to include time away from work for medical

25   treatment in her assessment of Plaintiff's RFC.  (Doc. 14 at 4-5.)  Plaintiff further contends that the

---

[3] The parties are advised that this Court has carefully reviewed and considered all of the briefs, including arguments, points and authorities, declarations, and/or exhibits.  Any omission of a reference to any specific argument or brief is not to be construed that the Court did not consider the argument or brief.

ALJ erred by failing to follow the directives of Social Security Ruling SSR 14-2p in her evaluation of Plaintiff's claim.  (Doc. 14 at 5-7.)  Finally, Plaintiff argues that the ALJ improperly discredited Plaintiff's subjective complaints and symptom testimony.  (Doc. 14 at 7-8.)

### A.  RFC – Time Away From Work

Plaintiff contends that the ALJ erred by failing to include time away from work for medical treatment in her assessment of Plaintiff's RFC.  (Doc. 14 at 4-5; Doc. 17 at 1-3.)  Plaintiff cites to medical records showing that Plaintiff's IVIG infusions have lasted for more than four hours.  AR 430, 432, 435, 437, 438.  Plaintiff additionally notes that he has required the infusions in varying frequency from once per week to five times per month.  AR 415-444, 899, 3319.  In response, Defendant argues that Plaintiff's alternate interpretation of the evidence is impermissible and the ALJ adequately considered Plaintiff's need to undergo IVIG infusions in the RFC and sequential evaluation.  (Doc. 16 at 4-7.)

An RFC "is the most [one] can still do despite [his or her] limitations" and it is "based on all the relevant evidence in [one's] case record," rather than a single medical opinion or piece of evidence. 20 C.F.R. § 404.1545(a)(1).  Indeed, "an ALJ's RFC determination need not precisely reflect any particular medical provider's assessment."  *Pinto v. Kijakazi*, No. 1:21-cv-00585-SKO, 2022 WL 17324913, at *9 (E.D. Cal. Nov. 29, 2022) (citing *Turner v. Comm'r Soc. Sec. Admin.*, 613 F.3d 1217, 1222-23 (9th Cir. 2010)); *see also Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) (finding RFC determination need not directly correspond to a specific medical opinion).  The Ninth Circuit has also made clear that "it is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity." *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001).  The Ninth Circuit further notes that, "[w]here evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005)(citing *Andrews v. Shalala*, 53 F.3d 1035, 1039–40 (9th Cir.1995)).

Plaintiff fails to demonstrate that the ALJ erred in her RFC assessment.  First, while Plaintiff attempts to argue that these infusions would cause him to miss an amount of work that employers would not tolerate, this argument is speculative and extrapolates from past treatment that has varied in frequency.  Indeed, Plaintiff notes that the "medical records show he received them as few as once a

month, and as much as five times a month depending on his health." (Doc. 14 at 4); AR 415-444 425 (ordering IVIG infusion daily for five days); 443 (Plaintiff arrived for "Day 5/5 infusion and is doing well today"); 899 ("we will continue with the last IVIG infusion and then we will space the patient out to 1 infusion every 4 weeks"); 1430 ("CIDP on IVIG once a month whom [sic] has been doing well but has had breakthrough migraines over the last 2 weeks and states that topamax has been most effective… feels that the neuropathy has been well controlled with IVIG."). The varying number and length of absences thus do not support Plaintiff's argument that the ALJ erred in incorporating Plaintiff's time away from work into the RFC assessment.

Beyond the uncertainty regarding the number and length of absences, it is also unclear that Plaintiff's absences would exceed a tolerable amount for employers. *See* AR 62 (VE testifying that employer would not tolerate two absences per month). Plaintiff argues that having one IVIG infusion per week would cause him to be absent more than the tolerated time and having one IVIG infusion per month would cause him to be absent more than the tolerated time due to travel, clinical, and recovery time. (Doc. 14 at 5). However, in support of his argument that travel, clinical, and recovery time would exceed the tolerated time, Plaintiff only cites one page of a progress note which does not specify the amount of travel time, time spent in the clinic, or recovery time. AR 441. Plaintiff also does not explain why IVIG transfusions would need to be done during or prior to work shifts. Plaintiff's speculative argument therefore does not show the ALJ's RFC assessment was flawed.

Second, the ALJ based her RFC assessment upon a rational interpretation of the record. "Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Burch*, 400 F.3d at 679. In *Shaibi v. Berryhill*, the Ninth Circuit noted that, "[a]t bottom, [plaintiff] argues that the ALJ could have come to a different conclusion in weighing the opinions of Dr. Izzi and Dr. Lochner, had the ALJ interpreted the words 'moderate' and 'substantial' differently." 883 F.3d 1102, 1108 (9th Cir. 2017). "But we are to affirm the ALJ's findings of fact if they are supported by substantial evidence and if the ALJ's decision was free of legal error… As we cannot say that the ALJ's interpretation of the available evidence was not rational, the ALJ's conclusions were supported by substantial evidence." *Id.* (citing *Burch*, 400 F.2d at 679). Similarly, the ALJ here considered the record, including treatment records and physician opinions. AR 26-29.

10

The ALJ did not ignore Plaintiff's IVIG infusions, but instead explicitly mentioned them while assessing Plaintiff's RFC.  AR 27, 28 ("The claimant has undergone periodic IVIG infusions for his neuropathy with good results, reporting much less weakness in his legs once starting this treatment… The claimant's leg strength had improved to 5/5 in the right leg and 4+/5 on the left leg with the IVIG infusions.").  The ALJ's rational interpretation of the evidence thus would prevail over Plaintiff's alternate interpretation.

Accordingly, the ALJ did not err by failing to include time away from work for medical treatment in her assessment of Plaintiff's RFC and the ALJ's RFC determination was supported by substantial evidence.  *See* 20 C.F.R. § 404.1545(a)(1).

**B.  SSR 14-2p**

Plaintiff next argues that the ALJ erred by failing to cite to SSR 14-2p and failing to follow its directives in evaluating claims involving diabetes.  (Doc. 14 at 5; Doc. 17 at 3.)  Defendant argues that the ALJ is not obligated to specifically cite SSR 14-2p and that the ALJ's RFC and disability determination addressed all functional limitations and impairments.  (Doc. 16 at 7-10.)

First, the ALJ did not commit reversible error by not explicitly citing SSR 14-2p.  SSR 14-2p assists ALJs in evaluating diabetes mellitus and notes that consideration of the "combined effects of DM and another impairment(s) can be greater than the effects of each of the impairments considered separately."  Soc. Sec. Ruling, SSR 14-2p; Titles II & XVI: Evaluating Diabetes Mellitus, SSR 14-2P (S.S.A. June 2, 2014).  The Ruling further states that ALJs must "consider all work-related physical and mental limitations, whether due to an adult's DM, other impairment(s), or combination of impairments."  *Id*.  However, the administrative ruling does not require it be explicitly cited by the ALJ in its opinion.  Further, the substance of SSR 14-2p aligns with other requirements regarding RFC and disability evaluations that were cited by the ALJ.  AR 26; *See* 20 C.F.R. § 416.929; Soc. Sec. Ruling 16-3p Titles II & XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3P (S.S.A. Oct. 25, 2017).  Accordingly, the ALJ did not err by not including a citation to SSR 14-2p in her opinion.

Second, the ALJ did not err in failing to follow the directives of SSR 14-2p.  This Ruling notes that the ALJ considers "all work-related physical and mental limitations, whether due to an adult's DM, other impairment(s), or combination of impairments."  Soc. Sec. Ruling, Ssr 14-2p.  This is

precisely what the ALJ did in her evaluation, basing the light work capacity evaluation and limitations on the medical record, physician opinions, and Plaintiff's symptoms testimony.  AR 26-29.  The ALJ discussed the complications and treatment of both the severe and non-severe impairments of diabetes mellitus, neuropathy, lumbar degenerative disc disease, psychogenic seizures, peptic ulcer disease, hypertension, chronic kidney disease, coronary artery disease with stenting, anxiety, depression, and COVID-19 within that evaluation.  *Id.*  The ALJ also discussed the manifestations of these diseases and their apparent interrelation.  *See* AR 27 ("The claimant sees his endocrinologist on a regular basis for medication and pump adjustments, and his diabetes has not resulted in complication or required any emergency or inpatient treatment… The claimant's primary care physician monitors his hypertension and kidney disease, which have largely come under good control with medication."); 27-28 (noting the management of Plaintiff's coronary artery disease with a stent and apparent management "[e]ven following a bout with COVID-19"); 28 (noting effects of IVIG infusions on seizures, leg strength, and neuropathic pain).  Accordingly, the ALJ properly considered Plaintiff's work-related physical and mental limitations both individually and combined.  *See* Soc. Sec. Ruling, Ssr 14-2p; 20 C.F.R. § 416.929.

Moreover, the ALJ properly considered that Plaintiff's Diabetes Mellitus was well-controlled in the RFC assessment.  "Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits."  *Warre v. Comm'r*, 439 F.3d 1001, 1006 (9th Cir. 2006) (quoting *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir.2004); *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir.1987); *Odle v. Heckler*, 707 F.2d 439, 440 (9th Cir.1983)).  The ALJ here found that, despite Plaintiff's symptoms testimony and impairments, there has been:

> improvement in the claimant's pain with medication and injection treatments, largely well controlled seizures, and successful control of his hypertension, kidney disease, and diabetes with medication. The claimant has an insulin pump for his diabetes, and with this, his blood sugar control has improved. The claimant sees his endocrinologist on a regular basis for medication and pump adjustments, and his diabetes has not resulted in complication or required any emergency or inpatient treatment (Exhibits 4F; 14F; 19F). The claimant's primary care physician monitors his hypertension and kidney disease, which have largely come under good control with medication. The claimant's blood pressure occasionally spikes while receiving IVIG infusion used to treat his neuropathy, but

overall, his PCP notes document stable blood pressure readings and has not referred the claimant to a nephrology specialist for his kidney disease (Exhibits 25F).

AR 27.  This is supported by the ALJ's citations to the record, which reveal relatively normal treatment notes, and stability or improvement with treatment.  AR 337-339 (four week follow-up reviewing labs, noting Plaintiff checks blood sugar three times per day); 340-342 (pump follow-up, noting that Plaintiff checks blood sugar three times per day); 343-344 (three month follow-up); 346-353 (follow-up pump appointment, no emergency treatment); 354 (noting Plaintiff likes the insulin pump, has been much better with it and has experienced "no hypoglycemia"); 1169-1174 (discussing recent labs and insulin pump settings, noting improvement on insulin pump); 1175-1179 (discussing follow-up for insulin pump, noting improvement with insulin pump and that blood sugar control has been severely impacted by not having access to his sensor); 1379 (insulin pump data reviewed, "no significant changes or events," Plaintiff "feels well" with no "hypoglycemia or hypoglycemic unawareness."); 1386 ("Blood glucose values trends up with meals. No hypoglycemia."); 3303 ("He states his BP did not rise today as it did with the last infusion."); 3317 (noting Plaintiff should continue current blood pressure medications and log his blood pressure, overall impression for hypertension is "stable"); 3328 (notes Plaintiff was "seen in the ER for High BP" but current plan is to continue current blood pressure medications and log his blood pressure); 3346 ("Per patient his BP has been stable").  The ALJ further noted that Plaintiff's peptic ulcer disease has been controlled by medications, Plaintiff's history of coronary artery disease was managed through an artery stent and medication, Plaintiff's neuropathy and lower back problems have been managed through prescription and consultations with a management specialist, Plaintiff's seizure disorder, headaches, and neuropathy have been managed through medication, IVIG infusions, and consultations with a neurologist, and Plaintiff's mental impairments are largely controlled with medication.  AR 27-29.  These interpretations align with the medical record, and demonstrate that Plaintiff's Diabetes Mellitus, both alone and in conjunction with his other impairments and complications, has been controlled through medication and treatment.  Given that the ALJ appropriately assessed the record to determine

whether Plaintiff's impairment could be effectively controlled, the ALJ properly assessed Plaintiff's impairments.

Accordingly, the ALJ did not err in her RFC assessment or in evaluating Plaintiff's claim.

### C.  Plaintiff's Subjective Complaints

Plaintiff next contends that the ALJ committed harmful error by failing to provide clear and convincing reasons for rejecting Plaintiff's testimony as inconsistent with the evidence.  (Doc. 14 at 7-8; Doc. 17 at 3.)

In deciding whether to admit a claimant's subjective complaints, the ALJ must engage in a two-step analysis.  *Garrison*, 759 F.3d at 1014; *Batson v. Comm'r*, 359 F.3d 1190, 1196 (9th Cir. 2004).  First, the claimant must produce objective medical evidence of her impairment that could reasonably be expected to produce some degree of the symptom or pain alleged.  *Garrison*, 759 F.3d at 1014.  If the claimant satisfies the first step and there is no evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.  *Id.* at 1015.

Here, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms.  AR 27.  However, the ALJ discounted Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms, noting that the statements were not consistent with medical evidence and other evidence in the record.  *Id.*  The ALJ was therefore required to provide specific, clear and convincing reasons for discounting Plaintiff's subjective complaints.

In summarizing and assessing Plaintiff's statements and subjective complaints, the ALJ noted:

> The claimant's statements about the intensity, persistence, and limiting effects of his symptoms are not fully supported by his objective medical evidence that documents improvement in the claimant's pain with medication and injection treatments, largely well controlled seizures, and successful control of his hypertension, kidney disease, and diabetes with medication. The claimant has an insulin pump for his diabetes, and with this, his blood sugar control has improved. The claimant sees his endocrinologist on a regular basis for medication and pump adjustments, and his diabetes has not resulted in complication or required any emergency or inpatient treatment (Exhibits 4F; 14F; 19F). The claimant's primary care physician monitors his hypertension and kidney disease,

which have largely come under good control with medication. The claimant's blood pressure occasionally spikes while receiving IVIG infusion used to treat his neuropathy, but overall, his PCP notes document stable blood pressure readings and has not referred the claimant to a nephrology specialist for his kidney disease (Exhibits 25F).

AR 28.  The ALJ further noted that Plaintiff's peptic ulcer disease has been controlled by medications, Plaintiff's coronary artery disease was managed through an artery stent and medication, Plaintiff's neuropathy and lower back problems have been managed with pain management specialist, Plaintiff's seizure disorder, headaches, and neuropathy have been managed through medication, IVIG infusions, and consultations with a neurologist, and Plaintiff's mental impairments are largely controlled with medication alone. AR 27-29.

First, the ALJ noted the inconsistences between Plaintiff's symptom statements and objective medical evidence in the record.  *Id.*  Although lack of supporting medical evidence cannot form the sole basis for discounting testimony, it is a factor that the ALJ can consider.  *See Burch*, 400 F.3d at 681.  In contrast to the limiting effects, persistence, and intensity Plaintiff alleged, the ALJ pointed to objective medical evidence in the record regarding each of Plaintiff's impairments and their combined effects.  AR 27-29.  For instance, the ALJ cited the normal findings from Plaintiff's visits with his endocrinologist following Plaintiff's use of an insulin pump.  AR 337-339; 343-344; 346-353; 354; 1169-1174; 1175-1179; 1379; 1386. The ALJ also cited stable blood pressure readings and treatment notes regarding Plaintiff's blood pressure.  AR 3303 ("He states his BP did not rise today as it did with the last infusion."); 3317 (noting Plaintiff should continue current blood pressure medications and log his blood pressure, overall impression for hypertension is "stable"); 3328 (notes Plaintiff was "seen in the ER for High BP" but current plan is to continue current blood pressure medications and log his blood pressure); 3346 ("Per patient his BP has been stable").  Accordingly, the ALJ properly considered medical evidence as one factor in discounting Plaintiff's testimony.

Second, "[i]mpairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits."  *Warre v. Comm'r*, 439 F.3d 1001, 1006 (9th Cir. 2006) (quoting *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir.2004); *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir.1987); *Odle v. Heckler*, 707 F.2d 439, 440 (9th Cir.1983)).  As discussed above,

Plaintiff has been able to effectively control his diabetes and blood pressure through treatment.  AR 337-339; 343-344; 346-353; 354; 1169-1174; 1175-1179; 1379; 1386; 3303; 3317; 3328; 3346.  The ALJ further found that Plaintiff's peptic ulcer disease, hiatal hernia, and gastritis is also controlled through prescriptions from his primary care provider.  *See* AR 27; 3303-3304 (listing Plaintiff's medications to control peptic ulcer and other diseases); 3307 (Plaintiff continuing Pantoprazole medication, scheduled for EGD procedure); 3309-3310; 3317 (noting tests related to abdominal pain were negative and Plaintiff was directed to continue medications as directed, exercise as tolerated, and return to clinic if symptoms worsen); 3312 (Plaintiff continuing Pantoprazole medication); 3322 (Prescription of Pantoprazole to deal with peptic ulcer disease); 3723 (Plaintiff discharged with Zofran for nausea, was able to keep a sandwich down); 3725 (prescription of Zofran and other medications); 3731 ("He is discharged home with a prescription for Zofran and should go back to taking his medications as previously instructed."); 3732 ("Zofran if needed for nausea").  Plaintiff's coronary artery disease required stenting, though the procedure was successful, and Plaintiff was discharged the following day.  AR 1092-1093.  After this procedure, Plaintiff's coronary artery disease has been managed primarily through medication and his progress notes have shown relatively normal cardiac findings.  AR 2223-2225, 2230-2232, 2233 (normal findings from imaging test), 2241-2243, 2245-2247.

The ALJ also found that Plaintiff's pain, neuropathy, and lower back problems were effectively managed by treatment from a pain management specialist, a Norco prescription and epidural steroid injections.  *See* AR 881-884 (injection helped with Plaintiff's pain and pain level is 1/10, noting that pain is made worse by reaching, bending, sitting or standing for a long time and made better by medication, physical therapy, and injections); 3440 (noting epidural steroid injection led to pain relief greater than 50% and Norco prescribed for pain).  Physical exams include relatively normal findings, showing mildly reduced lumbar flexion and poor ability to heel and toe walk.  AR 1355-1359, 3441, 3445, 3449, 3454, 3458, 3462, 3467, 3474, 3483, 3488, 3494, 3499.  In addition, a lumbar imaging test showed normal findings for Plaintiff's bones and discs and only mild spurring at L3-L4 and L4-L5 with no disc space loss.  AR 1354.

The ALJ further found that Plaintiff's seizure disorder, headaches, and neuropathy were effectively treated via medication and consultation with a neurologist.  AR 28, 898-909; 1413-1440; 3505-3616.  Through 2019, Plaintiff had been responding well to medication and had not had a seizure between January 2019 and June 2019, though the neurologist modified Plaintiff's prescription following a small seizure in January 2019.  *See* AR 898 (July 29, 2019 progress note stating "Patient states that he has had significant relief with IVIG in his legs and has strength back as well as limited neuropathy pain.  Patient had a seizure while he is on Keppra so his medication was changed to Depakote 251 g twice daily as well as Topamax and 50 mg twice daily use of gabapentin…"); 901 (June 24, 2019 progress note states "patient has been doing well. He continues to be on Keppra 1500 mg twice daily and Dilantin 150 mg three times daily. He has not lost consciousness."); 904 (June 14, 2019 progress note noting that Plaintiff had first seizure since January 2019 while working outside in the heat, though "it did not last long and he did not have a significant post ictal state.").  Breakthrough seizures occurred during 2020 when Plaintiff was unable to take his anti-seizure medication or when he was hospitalized with COVID-19, though Plaintiff's seizures and headaches were otherwise generally well-controlled throughout 2020.  *See* AR 1413 (September 15, 2020 progress note stating Plaintiff "reports he had one seizure over the weekend but prior to this his last seizure was in July."); 1416 (July 31, 2020 progress note with no seizure or headache events discussed); 1419 (May 19, 2020 progress note stating Plaintiff had mild migraine headaches and breakthrough seizures after he was unable to keep down seizure medication due to nausea); 1424 (April 20, 2020 progress note stating nausea due to IVIG but no apparent seizure or migraine events); 1427 (March 24, 2020 progress note stating "migraines are controlled" and "no seizures"); 1430 (February 14, 2020 progress note stating Plaintiff had breakthrough seizure and breakthrough migraines, but notes that Topamax has been effective, neuropathy was well-controlled with IVIG, and a current migraine was at a 4/10 level); 3509 (June 15, 2020 visit report stating "no reports of any generalized seizure activity recently" and "No headache"); 3523 (December 19, 2020 discharge summary noting "Patient was planned for EGD, then patient had breakthrough seizure and EGD was deferred."); 3530 (December 14, 2020 contact where provider states Plaintiff "is on Depakote for seizures he has had 2 seizures today because he says he simply cannot keep anything down and this is causing him to have these complications… He is

17

currently stable well and in no acute distress."); 3538 (emergency documentation noting Plaintiff was unable to keep his seizure medication down and had two seizures, but later "No recurrence of seizures since he received the medicine. Pain is improved.").

The ALJ additionally noted that Plaintiff's "mental impairments are largely controlled with medication alone."  AR 28-29; *See* AR 311-312 (May 22, 2018 progress note listings Plaintiff's medication and noting Plaintiff's mood has improved and he denied difficulty falling asleep, diminished interest or pleasure, excessive worry, fatigue, hallucinations, loss of appetite, paranoia, poor judgment, racing thoughts, restlessness, or thoughts of death or suicide"); 318-319 (July 30, 2018 medication management visit report noting generally normal findings in mental status exam and "mood 'good', concentration 'good'… Patient finds medication helpful"); 322-325 (February 26, 2019 medication management visit report noting prescriptions of Paxil, Abilify, and Trazadone, mental status exam with generally normal findings); 329-330 (April 9, 2019 visit report noting "anxiety is coming down, not as depressed", normal mental status examination findings); 1416 (July 31, 2020 visit report noting Plaintiff "is inquiring about starting medication for anxiety again because he has been very anxious and has not been able again [sic] to psychiatrist due to the current pandemic. We have tried the patient on Lexapro before which did help him significantly and I discussed that we can start that again and I would like him to make appoint with psychiatry as soon as he is able."); 1413-1414 (September 15, 2020 visit report noting "Last visit we restarted patient on anxiety medication which has been helping and he is pending appt with psychiatry… Patient states that he feels better with celexa in regards to anxiety." Also noted in psychiatric observation findings "No depression, anxiety or agitation.").  Accordingly, the ALJ properly found that Plaintiff's impairments were effectively controlled and not disabling for the purpose of determining eligibility for SSI benefits. *Warre*, 439 F.3d at 1006.

Plaintiff further argues that the ALJ erred by not specifying which of Plaintiff's testimony he did not find credible and which evidence undermined the testimony.  (Doc. 14 at 7-8, Doc. 17 at 3.) Defendant responds that the ALJ properly discounted Plaintiff's subjective complaints by comparing the record to specific symptoms the Plaintiff alleged.  (Doc. 16 at 10-15.)

1    In his argument, Plaintiff cites *Lambert v. Saul*, in which the Ninth Circuit held that "[o]ur

2  cases do not require ALJs to perform a line-by-line exegesis of the claimant's testimony, nor do they

3  require ALJs to draft dissertations when denying benefits.  But our precedents plainly required the

4  ALJ to do more than was done here, which consisted of offering non-specific conclusions that

5  Lambert's testimony was inconsistent with her medical treatment."  980 F.3d 1266, 1277 (9th Cir.

6  2020) (citing *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1103 (9th Cir. 2014); *Burrell v.*

7  *Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014)).  The Court there noted they "cannot review whether the

8  ALJ provided specific, clear, and convincing reasons for rejecting [Lambert's] pain testimony where,

9  as here, the ALJ never identified which testimony she found not credible, and never explained which

10  evidence contradicted that testimony."  *Id.*  (citing *Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th

11  Cir. 2015)).  Plaintiff further cites to *Laborin v. Berryhill*, in which the Ninth Circuit reviewed a case

12  where the ALJ discredited the claimant's testimony "regarding the intensity, persistence, and limiting

13  effects of his symptoms to the extent that testimony was 'inconsistent with the above residual

14  functional capacity assessment.'" 867 F.3d 1151, 1152 (9th Cir. 2017).  There, the Ninth Circuit found

15  that the boilerplate language was insufficient to provide specific, clear and convincing reasons for

16  discrediting the claimant's testimony.  *Id.*  at 1154-1155.

17    However, these citations are inapposite as the ALJ here relied on more than boilerplate

18  language or non-specific conclusions to discredit Plaintiff's testimony.  In the decision, the ALJ first

19  laid out the key parts of Plaintiff's testimony regarding the intensity, persistence, and limiting effects

20  of his impairments:

21        The claimant testified that he is unable to work because of his seizure
         disorder and pain. The claimant reported that he has pain in his legs on a
22        daily basis and for the past month, his seizures have been occurring more
         than once a week. The claimant also has back pain and frequent problems
23        with stomach pain and vomiting. He estimated that he is able to stand for
         20 minutes and sit for 20 minutes before he has to change positions due
24        to pain. He estimated that he is able to lift 10 to 15 pounds. The claimant
         testified that he spends most of his time lying down as that position helps
25        him to feel less pain. The claimant uses a motorized scooter at the grocery
         store.
26

27

28

1  AR 27.  The ALJ then found that Plaintiff's "statements concerning the intensity, persistence and

2  limiting effects of these symptoms are not entirely consistent with the medical evidence and other

3  evidence in the record for the reasons explained in this decision." *Id.*  The ALJ supported that finding

4  by reviewing the evidence regarding each of Plaintiff's impairments to determine how consistent they

5  are with the intensity, persistence, and limiting effects Plaintiff alleged.  AR 27-29.  During this

6  review, the ALJ specifically noted that Plaintiff "testified that he has been experiencing near daily

7  seizures, but his neurology notes do not support this testimony" before summarizing evidence showing

8  Plaintiff had suffered a few breakthrough seizures and his seizure disorder was relatively well-

9  controlled.  AR 28, 898-909; 1413-1440; 3505-3616.  The ALJ also noted that Plaintiff "reported that

10  he has pain in his legs on a daily basis and for the past month… [and] has back pain and frequent

11  problems with stomach pain and vomiting."  AR 27.  The ALJ then discussed contradictory evidence

12  showing Plaintiff's back pain and stomach pain was adequately controlled through medication.  AR

13  881-884 (injection helped with Plaintiff's pain and pain level is 1/10, noting that pain is made worse

14  by reaching, bending, sitting or standing for a long time and made better by medication, physical

15  therapy, and injections); 3440 (noting epidural steroid injection led to pain relief greater than 50% and

16  Norco prescribed for pain).  The ALJ also noted that Plaintiff's stomach pain and vomiting was

17  controlled through medication for his peptic ulcer disease, hiatal hernia, and gastritis.  *See* AR 3303-

18  3304; 3307; 3309-3310; 3317; 3312; 3322; 3723; 3725; 3731; 3732.  Unlike *Laborin,* the ALJ here did

19  not simply rely on broad boilerplate language discrediting any testimony inconsistent with the ALJ's

20  residual functional capacity assessment.  And unlike *Lambert*, the ALJ identified Plaintiff's allegations

21  of pain and symptoms testimony regarding limiting effects, persistence and intensity before discussing

22  the evidence that contradicted that testimony.  While the ALJ did not perform a line-by-line exegesis

23  of the claimant's testimony, she discussed how the symptoms and limitations alleged by Plaintiff were

24  not supported by the record.

25  　　　The Court therefore concludes that the ALJ did not err in discounting Plaintiff's subjective

26  complaints and the ALJ's disability determination was supported by substantial evidence.

27  　　　///

28  　　　///

## **CONCLUSION**

For the reasons stated, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards.  Accordingly, this Court DENIES Plaintiff's motion for summary judgment and appeal from the administrative decision of the Commissioner of Social Security.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Kilolo Kijakazi, Acting Commissioner of Social Security, and against Plaintiff Anthony Castro Jr.


IT IS SO ORDERED.

Dated:   **May 26, 2023**                    /s/ *Barbara A. McAuliffe*

UNITED STATES MAGISTRATE JUDGE